Bill Kennedy, in pro se. I want to reserve about five minutes. All right, I'll try to help you do that. There are two problems with this, the way this case was decided. The first, dealing with the conversion, which is governed underneath 11 U.S.C. 1112b, has two steps, per the Hinkson Court. The first step is to determine cause by the preponderance of evidence. My papers have shown that I don't think cause has been established by any shred of evidence, much less preponderance. But let's just set that aside. The second step in the conversion is the comparison. Comparison of the conversion value versus the dismissal value. So you can think of it as a scales. On one side, we have the value of the conversion. On the other side, we have the value of the dismissal. Whichever one predominates should be the way the decision is made. In August 2015, the conversion was granted. It was granted 21 days before a jury trial was scheduled to start, which trial had been postponed two previous times by NexGen and by the bank. Binders were ready. The questions were ready. The lawyers were ready. Five months later, after a reconsideration motion and after a settlement that was reached between the trustee and the bank and NexGen, there was a settlement hearing on February 10, 2016. Now, the value of the conversion was clearly to be determined as the value of the settlement. If the bank had wanted to go to the trial, it would have simply waited 21 days from the rescheduled jury trial, which was to start on February 29. The bank, over the course of eight years, took every conceivable step to avoid a trial. There are over 1,600 docket entries in the Superior Court and in the Bankruptcy Court. That's roughly four to four and a half to five docket entries per week, relentlessly, for eight years. There were 55 motions to convert, 35 by the bank and approximately 20 by the U.S. trustee, giving a total of about 54, which everybody agrees as the number. Now, in the settlement discussions, the creditors were shut out. The settlement discussions occurred primarily between the trustee and the defendant. Now, the defendants hold disputed claims. Those are the only claims that are disputed. The creditors hold undisputed claims. At the hearing on February 10, which was held concurrently with the settlement, same courtroom, same judge, same parties, same time, the settlement was agreed that its value was zero. Both the court said this and the trustee said this. So going back to the scales, for the undisputed creditors, on the scales for the conversion, there is a zero. For the disputed creditors, the value, of course, is the elimination of a $13 million damages lawsuit. So now we should go over to the side of the scales that deals with the value of the dismissal. The value of the dismissal was everyone knew that once it was to be dismissed, there would be the beginning of the lawsuit, beginning of the trial. So the dismissal value is identical to the lawsuit value. And the lawsuit value in this case for liability was there was no one contested the liability, at least not during the court, during the course of the hearings. And as far as damages are concerned, 96 percent of the damages were undisputed. So in valuing a lawsuit in which there is no dispute on liability, an agreement on 96 percent of the damages, the trustee came to the conclusion that it had one chance in 133 of being successful. How did he get the one chance in 133 of being successful? Well, you take the, as a numerator, the $52,679 that was agreed to for the settlement, and as a denominator, the damages, 96 percent of which were agreed. That turns out to be three-quarters of one cent on the dollar, or one part in 133. How do you value a lawsuit? Well, it's established clearly that it's done through the four factors in A and C. That is to say, the probability of the success of litigation, which in this case had 100 percent liability and 96 percent damages agreement. Two is whether you can collect, and here we're dealing with collection against a bank publicly owned. Three is the litigation, its complexity, its expense, its inconvenience, and its delay. Well, the delay was nonexistent because it was to start in 19 days. The expense for the weak state attorneys were working on a contingency basis. And then fourth factor in the A and C factor is the interest of the creditors, which are to be paramount. This is consistent with the TMT decision, which made it with exceptional clarity how this is handled. And TMT states, quote, basic to this process, in every instance, of course, now of course is not mine, it's the Supreme Court's, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. How did the district court view this? The district court said that the A and C was not applicable. It was very clear about this. It said it three times. That is to say, it effectively ignored the claims of the lawsuit. The bankruptcy court was equally clear. It said A and C was unsupported and irrelevant, thereby ignoring the claims of the lawsuit. So A and C is how the lawsuit is valued and A and C is how the dismissal is valued. So on the side of the scales over here for the value of the dismissal, we don't have anything because it wasn't evaluated. This is a problem. This is the first problem. The second problem is the settlement. Now, the settlement, all agree, was done by the four factors of the A and C. However, what is not in agreement is what are the criteria used to establish the four factors and how do you know when you've met the four factors? Well, the answer to that was provided through PG&E and the Rake decisions, which were made at bankruptcy court level, not at BAP level, district court, or circuit court level. They are established by saying that it is not a money trial, which all agree. But there is a condition to that, and that condition is the TMT requirement that it be a fair and equitable, proper and independent assessment of the claims. The trustee made no such independent analysis. Why do I say this? Well, it goes to the second way in which the four A and C factors are established or know whether they have been met, and that is that the settlement must not fall below the lowest level. That is, it must not fall below the lowest level of reasonableness. Now, there's a problem with this. Falling below the lowest level of reasonableness helps those who have something to lose. But in all instances, we know there are two parties. One party has something to lose. Another party has something to gain. If we are to so the not fall below the lowest level is the best case for the party who has something to lose. It is the worst case for the party who has something to gain. So if you were to be truly impartial about this, you should add, in addition to the not fall below level, you should add something of the nature of not rise above the highest level of reasonableness. Then you have attained some degree of impartiality. Because if not rising above the highest level is then to the best advantage of those who have something to gain, but to the least advantage of those who have something to lose, so somewhere along the line you might be able to secure an impartial decision. Would you like to reserve the remaining time you have, about four minutes and 20 seconds? Thank you, Your Honor. Would you like to reserve that rebuttal? I have just a little bit more, ma'am. Okay. It's your rebuttal, so I leave it to you. Okay. So the question is, so what? Well, the bankruptcy court and the district court give us a clear answer. They have defined what the lowest level is. In this case, the lowest level is $52,679. And how did they arrive at the $52,679? Well, they simply asked the bank which creditors they like, and that turned out to be $52,679. The district court said that the bankruptcy court is not required to set forth how the bank arrived at the amount of $52,679 and was similarly stated by the bankruptcy court that said the compromise does not fall below the lowest level, possible level in the range of reasonableness. The question is then, are we seriously to believe that the $52,679, it meets the TMT fair and equitable standard of being fair and equitable, proper and independent assessment of the claims? Well, the trustee thinks so. Bankruptcy court thinks so. The district court thinks so. If this is the case, if this is the definition of the lowest level, it is a very low-level definition of the lowest level and is sure to ricochet around the judicial branch for some period of time. It is a stunning victory for the banks. It is a stunning loss for the – it is a stunning loss that is ill-deserved for the citizens. Thank you. Thank you. I understand that Mr. Kleiner will argue first. Is that correct? Yes. And just to make sure I have the cases correct, your case, 17-15488, is the settlement case? That's correct, Your Honor. Thank you. Your Honor, Greg Kleiner. I am counsel for Fred Yalmaset. Mr. Yalmaset is the Chapter 7 trustee for the bankruptcy estate of Week Street. Mr. Yalmaset was appointed in September of 2015, and immediately after his appointment began his review and evaluation of the litigation that Mr. Kennedy was just speaking about. This is a state court litigation that was quite anomalistically filed in the Superior Court of California per the instructions of the prior bankruptcy judge, Judge Weisbrot, and proceeded in that court for approximately five years up to the point that the case was converted. Mr. Yalmaset and I and others at my prior firm looked at the litigation, evaluated the litigation, looked through documents and information related to that litigation, and ultimately spoke with both counsel for special counsel who was engaged by Week Street, the debtor, who was pursuing the litigation, and counsel for the bank and for NextGen. Through that evaluation, it was concluded that we didn't think it was a particularly strong case. In fact, we thought it was a very weak case for the reasons that are set forth in the brief, which I can go through. But those are quite simple. There was no discovery taken on the part of Week Street as to the bank and to NextGen. The debtor had not engaged an expert witness. There were no expert witness reports. They had not designated a witness list before trial. And the primary witness, including for evaluating items such as damages, was going to be Mr. Kennedy. I reviewed a binder that I believe was over four inches thick that included much of Mr. Kennedy's calculations as to what damages would be. And it was off based on his prior testimony under a deposition that was conducted weeks before the conversion of the case by over $2 million. The trustee did not have a lot of confidence in this case, believed it was not a particularly strong case, and concluded it was in the best interest of creditors to settle the case, and that's what the trustee did. The case was, the settlement was put together in December and January of 2015 and 16. And under the ANC factors, I believe, both the District Court and the Bankruptcy Court concluded that it was in the best interest of creditors to proceed with this settlement. I can go into more details if the Court has any more comments. I have one question, though. This really arises out of Mr. Kennedy's comments. He made two points that I think bear a response. One, in his view, the creditors were shut out of the settlement, and two, there was no independent analysis. Would you comment on those? Let me address the second one first in terms of independent analysis. The Bankruptcy Court reviewed the information that was put forward both by the trustee, the bank, NextGen, and by the creditors, and concluded that there was, that they believe, both of those courts believe, that this was not a particularly strong case for the reasons that are set forth in Judge Johnson's opinion. Had the trustee thought this was a strong case, he certainly would have proceeded. It would not have made sense not to proceed because it was so close to trial. But because it was so close to trial and the case was so visibly weak to both the trustee and the trustee's opinion and my opinion, that the trustee concluded it was in the best interest to settle it. It was not a $13 million case. It was a $100,000 case. And only after the settlement was consummated and we were able to sell some vacant lots that were sold in 2017, another $320,000 in cash came into the estate from the settlement. After payment of real estate taxes, I think the estate netted about another $240,000 from that $320,000 sale, Your Honor. I'm sorry, your second question was? Whether the creditors were shut out of the settlement. That was a comment Mr. Kennedy made. The creditors certainly had an opportunity once the settlement agreement was negotiated. They were part of the negotiation. These were confidential settlement negotiations. But once the settlement was brought forth to creditors and made available to them, they had an opportunity to comment, in which they did. Not all of them were supportive, but not all of them rejected the settlement. And in terms of their desire in thinking this was not a particularly strong settlement, under the Mickey Thompson case, they had an opportunity to say, hey, we'd like to buy this litigation from the trustee. The trustee has the right to sell this type of litigation. No offer was made. Mr. Kennedy's brief, I think it was at the district court level certainly, went at length to note that he had felt that they had given up. You know, they had agreed essentially to cede their pre-petition claims as something to the estate and believed that that had value to the estate. It doesn't have value because an unpaid pre-petition claim is just that. There's nothing that can be distributed from that to creditors. They wanted to roll the dice. They wanted to try and move forward with this litigation. And the trustee concluded and the bankruptcy court and the district court agreed that the litigation was not strong enough or wasn't likely to be successful. And they agreed with the trustee's analysis that the matter should not go to trial and that it was in the best interest to settle it at that point in time. The net to the estate was close to $450,000 after the sale of the lots, which were part of the consideration that was provided to the trustee from the bank. I don't know if the Court has any other questions. I'm glad to address them. Thank you. If not, thank you, Your Honor. Thank you. Good morning. May it please the Court. My name is Dennis Miller. I'm with Luben Olson and U. Adamski. And I represent First National Bank of Northern California, one of the appellees. First National Bank, as we filed the corporate information sheet in this case, has been acquired by Tri-Counties Bank. But for convenience, since we've had three years of litigation as First National Bank, it's probably easier for me to refer to them as First National Bank still. I wanted to address the conversion issue. But before I got there, I just wanted to make a couple of very quick comments. In Mr. Kennedy's open statement, he made a comment that the liability claims that the debtor was asserting against the bank were not contested. Yet, in the same time, he also mentions that there's voluminous pleadings over four years in the San Mateo Superior Court contesting the case. So I just wanted to clarify that the bank had contested liability from day one through the entire case. Second, the offer seems to be portrayed as only $52,000. I think Mr. Kleiner just specifically noted it was the bank came out of pocket $52,000 plus in change. There was over $35,000 in the case subject to the bank's security interest, and the four vacant lots that were also subject to the bank's security interest. So on its face at the time that the settlement came up, we were looking at $450,000, which was a number presented by the debtor, and Mr. Kennedy is this responsible person, plus $52,000 plus $35,000. So it was a significantly higher offer than would be put up. Going to the conversion, we had raised an issue by motion on whether or not Mr. Kennedy has constitutional standing to bring this appeal, and I just wanted to go through that briefly because this case has, I guess I would say, facts that support our argument that there is no constitutional standing. He has no injury. At the time of the conversion motion, the only asset of the case was the lawsuit, and as we pointed out in our brief, at conversion, after it was converted, the lawsuit was not affected because Mr. Helmas at the Chapter 7 trustee had a fiduciary obligation to the estate, and I think has been mentioned in many pleadings herein. He could choose to proceed with the litigation. Mr. Kennedy did not have any property interests that were affected by the conversion order. He may have had a claim in the case, but at the conversion, there was no change. There was no alteration to his rights. There was no alteration to any of the creditor's rights. We simply went from Mr. Kennedy as a fiduciary to Mr. Helmas as a fiduciary. So that's why we think that the motion should be granted on lack of constitutional or lack of standing, and I realize that's still presented in our brief. Second, going to the conversion, I think the test that Mr. Kennedy advocates is not the appropriate one to decide whether or not the court had the basis to convert or dismiss the case. The statute says that the court can convert or dismiss the case for cause. Obviously, in this situation, there had to be a finding for cause, and we presented that all throughout. The reason, and looking at Judge Johnson's order, which went into great detail, was that Mr. Kennedy, at the point in time, was prosecuting the lawsuit only for his own personal benefit, not to think of the benefit to creditors. And this is pointed out in the record numerous times. We raised it in the motion to convert, and the Hampton factors that we presented listed the grounds for which a court can find cause. The statute is not limited to simply the examples given, and the legislative comment to the statute says that the bankruptcy court has wide discretion in making this decision. What we had here factually was the debtor's plan had no mention of settling the case. We had a mandatory settlement conference in the San Mateo Superior Court. No offer was made by the debtor, which was a violation of the San Mateo local rules. Mr. Smith, who is the attorney for the debtor, even provided this information in his declaration submitted to the court. We also had hearings on these issues, both on the debtor's motion to dismiss his case and on the bank's motion to convert. As the issue came up through those time periods that this was a breach of fiduciary duty, at no point did the debtor come in and say, okay, give me a mandatory settlement conference. Let me sit down and have a settlement conference with the bank. Let me make a counteroffer to the bank. So when you're looking at the evidence, the preponderance of the evidence here, what we've got is all the evidence on the bank's side said we made a proposal, we made numerous proposals, they were verified in open court, and despite having numerous opportunities, the debtor never came forward and said, I will enter into settlement negotiations. And the reason why is because had the debtor prevailed in the litigation, then anything over and above what was there required to pay creditors would go into the principal's pocket. Mr. Kennedy is the sole owner of the LLC debtor entity. So that was the reason that we ended up with Judge Johnson finding that it was appropriate to convert or dismiss the case. I'd also like to point out in terms of cause being shown, the debtor filed a motion to dismiss prior to the bank's second motion to convert, which the debtor said, we think there's grounds to dismiss this case because, and they elucidated four or five different factors, including insolvent, unable to pay administrative claims. So that's in the record. Also, if you're looking for a basis for the court to reach, I mean the bankruptcy court, to find cause to reach a decision to convert or dismiss, the debtor's own admissions weeks before support that also. So the record is replete with cause. And one other issue which I'd like to point out in support of the trustees, the settlement issue is in the state court, and this is also Mr. Smith's employment order, he originally agreed to fund the costs of that litigation, and that didn't happen. So trial counsel for the debtor in the state court did not fund the litigation. None of the creditors came up. There's nothing in the record to say they offered to fund the litigation. They didn't offer to pay for experts. And when the issue was presented in the bankruptcy court with the settlement on the record, I noticed to all the creditors, no one came in at that point and said, we'd like to buy this claim. So I think if you look at all the overall factors, A, there's sufficient evidence that satisfies the preponderance of evidence standard that Judge Johnson was correct in deciding that cause existed to convert or dismiss. And then for the reasons that we also pointed out in the brief, he was correct in deciding to convert the case to Chapter 7. And I don't believe that Mr. Kennedy, on his appeal, has proven that there's any error made by Judge Johnson in those findings. Thank you. Mr. Kennedy, you have two and a half minutes for rebuttal. Your Honor, concerning Mr. Kleiner's $2 million, this is the very first time I've ever heard that figure in 12 years, never come up before. It came up today at 9.30. As far as speaking to the attorneys, the lead trial attorney, Mr. Kleiner spoke to him for 20 minutes for a case that had been going on for eight years. And for the assistant to him, he spoke to him about 40 minutes. That's it. As far as the creditors, in fact, did offer to relinquish all of their claims in the bankruptcy court, which is over $3 million, and then have them all tried in the superior court. So, in fact, they did make a proposal. They proposed to live well over $3 million by exiting all of their claims from the bankruptcy court. The $320,000 that Mr. Kleiner is speaking about, that happened two years after the hearing. The hearing was in 2015 and early 2016. They consummated the sale two years after that. So it wasn't in front of anybody at the time that the consideration or the settlement was occurring. And as far as the plan is concerned, the plan was never heard. The plan was set up to be heard on January 7th. We set a hearing for October 8th, and the case was converted on September. I think it was 10 days before we had the first chance to get a plan. And that's a violation, and that's an abuse of discretion, as pointed out in my opposing papers. As far as what they authenticated, the bank never made an authenticated settlement offer. If you look at the papers, the only authenticated offer comes from the Wheat Street attorney, in which he commented that they made an offer. That's it. There was never any authenticated offer. Besides that, this occurred between the settlement conference on July 23rd and the motion to convert, which was September 23rd. It was a very active period. There was a motion to dismiss, there was a motion to convert, and there was a plan. That was occupied all of my time, which I have to spend in order to come to speed on all of this, in order to prepare those documents. There was no argument about that. Thank you very much. Thank you. I'd like to thank all parties and their counsel for argument in both cases that were consolidated for argument. The cases of Kennedy v. Wheat Street 17-15488 and Kennedy v. Wheat Street 17-16047 are now submitted. Thank you.
judges: McKeown, W. Fletcher, Ezra